IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DR. JANEL BELL-HAYNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:21-cv-18-ECM |
| | ) | (WO) |
| ALABAMA STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

## I.  INTRODUCTION

Now pending before the Court is the motion for summary judgment filed by Defendant Alabama State University ("ASU"). (Doc. 20).  ASU denied Plaintiff Janel Bell-Haynes's ("Plaintiff") application for tenure during the 2018–2019 academic year, which resulted in the issuance of a terminal contract for the 2019–2020 academic year.  She brings claims against ASU pursuant to Title VII of the Civil Rights Act of 1964 for sex discrimination and retaliation for denying her 2018–2019 tenure application (Counts I and III); and sex discrimination and retaliation for issuing her a terminal contract (Counts II and IV).[1]  Based on a thorough review of the record, the briefs, and the law, for the reasons to be discussed, the motion for summary judgment is due to be GRANTED.

---

[1]  In her opposition to summary judgment, Plaintiff fails to address ASU's motion for summary judgment on her sex discrimination claim for the terminal contract (Count II). "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted).  Plaintiff, therefore, has abandoned this claim and ASU's motion for summary judgment is due to be GRANTED as it pertains to Count II.

## II.  JURISDICTION

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(4).  The parties do not contest personal jurisdiction or venue, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  A "genuine" dispute of fact exists "if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996).  An issue of fact is "material" if it could "affect the outcome of the case under the governing law." *Id.*  The movant bears the initial burden to identify evidence showing no genuine dispute of material fact remains, or that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the movant satisfies this burden, then the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," and they do so by citing to particular parts of the record or by showing the cited materials do not establish the presence or absence of a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); FED. R. CIV. P. 56(c)(1).  If the non-movant fails to support their version of the facts or to properly address the movant's version

of the facts as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

At the summary judgment stage, the Court must view all evidence in the light most favorable to the non-movant and draw all justifiable inferences from the evidence in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Sprowl v. Mercedes-Benz U.S. Int'l, Inc.*, 815 F. App'x 473, 478 (11th Cir. 2020) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987)).

## IV.  FACTS

### A.    Promotion and Tenure Procedure at ASU

ASU's board of trustees makes all tenure appointments and promotions. A professor must be employed on a probationary contract (a tenure track contract) at ASU for at least four years before she can apply for tenure. If, after seven years on a probationary contract, a professor does not obtain tenure, then she will be denied reappointment—i.e., her final (seventh) year on the probationary contract functions as a terminal contract. Written notice of this terminal contract must be sent before the contract expires. Normally, the provost sends a warning memo to a faculty member before her sixth probationary year indicating that she must obtain tenure by the end of that year to avoid a terminal contract.

ASU has four ranks of professorship. At the lowest rank, an instructor must have a master's degree in the assigned teaching field. Next, an assistant professor must have a terminal degree (e.g., a doctorate) in a discipline related to its teaching field, or have a

3

master's degree in that field, have three years collegiate teaching experience, and be part of a doctoral program in that field.  An assistant professor can apply to be promoted to an associate professor if she has earned a terminal degree in a related discipline and has five years of collegiate teaching experience, three of which were as an assistant professor.  If an associate professorship constitutes a promotion in rank from within ASU, then a candidate must go through ASU's promotion review procedure.  Finally, a full professor must have all these credentials, along with ten years of collegiate teaching experience, three at the rank of associate professor.

The promotion and tenure review procedures at ASU generally have the same requirements.  Promotion to associate professor requires a candidate to score at least 3.0 on her overall performance rating assessment, and at least 2.0 in the research and creativity assessment.   Areas that factor into the overall performance rating are teaching effectiveness, research and creativity, academic citizenship, and community service. Documents supporting a candidates' application are compiled into a dossier to be submitted to faculty members in the department to which the candidate is applying, constituting a Promotion Review Committee ("PRC").  The PRC consists of the department chair and four faculty members—three from within the department and one from another department. Dossiers include relevant publications to be considered in the candidate's research assessment.  The PRC reviews the dossier and submits a promotion assessment form and recommendation to the dean of the appropriate college.  If the department chair is the

4

faculty member under consideration for promotion, then the dean of the college takes the chair's place on the PRC.

The dean adds the PRC's recommendations to the candidate's dossier, and then submits his own written recommendation to the provost and vice president for academic affairs. The provost independently evaluates the dossiers before submitting his own recommendations to ASU's president. If the president concurs with the provost to approve promotion, then he passes on the final recommendation to the board of trustees for final approval.

The tenure review procedure is almost identical to that for promotion. The overall performance and research assessment requirements remain the same. The candidate's dossier requirements likewise are the same. The one difference between the procedures is that the candidate's Tenure Review Committee ("TRC") consists of *all* tenured members of the appropriate department and one tenured faculty member from another department. The process for recommending tenure to the dean, provost, president, and board of trustees remains the same.

If, being denied promotion or tenure, or issued a terminal contract, a faculty member believes the decision violated handbook procedures, then she can file a grievance with ASU's Faculty Grievance Committee ("FGC"). The FGC should then "seek to bring about a settlement of the issue." (Doc. 22-4 at 54). The FGC may also "conduct a further investigation on its own initiative." (*Id.* at 64). If there remains no resolution to the grievance, the FGC reports its findings and recommendations to the petitioner, the

appropriate administrators, and the provost.  The provost thereafter reviews the FGC's report and issues a final decision on the grievance.  If the faculty member thinks that the original decision violated federal employment laws, however, then she must submit the allegations, in writing, to the president, who then conducts an investigation.

## B.    Plaintiff's Employment at ASU

Plaintiff began teaching on a full-time basis at ASU's Percy J. Vaughn College of Business Administration ("COBA") in 2008.  COBA is divided into three departments: accounting, business administration, and computer information science.  Each department has its own chairperson, while COBA has one dean.  Plaintiff taught marketing, management, and economic courses in the business administration department.  She first taught on a part-time basis as an adjunct instructor in 1992.  After a five-year absence from 2003 until 2008, Plaintiff returned to ASU as the full-time acting chair of the business administration department and an instructor of marketing.  ASU hired her to be the permanent chair of the business administration department in December 2013, active January 2014, awarding her a tenure track (probationary) contract as an assistant professor of marketing.

### 1.    *2017–2018 Promotion and Tenure Application*

During the 2017–2018 academic year, Plaintiff applied for tenure and promotion for the first time.  Her review committees quarreled over whether she had the requisite terminal degree in her teaching field and whether a publication she co-authored qualified as a book chapter for research purposes.  She earned the following degrees:  a Bachelor of Science

in Marketing; a Masters in Business Administration; an Ed.D. in Educational Leadership, Policy, and Law; and a Post-Doctoral Bridge Degree/Certificate specializing in Marketing and Management, which enabled holders of a non-business terminal degree to achieve doctoral qualification in their teaching area.  The publication at issue was a chapter the Plaintiff prepared with fellow faculty member Sara Kiser ("Kiser") for a book written by William Pickard ("Pickard").

Plaintiff's PRC in 2017–2018 was composed of Kiser, Tammy Prater ("Prater"), Jiin Wang ("Wang"), and Kamal Hingorani ("Hingorani").  Because Plaintiff was the chair of her own department, per the handbook, Hingorani, as COBA's dean, sat in her place as PRC chair.  Hingorani and Wang did not consider Plaintiff's Ed.D., paired with the bridge degree, to be a terminal degree in marketing.  They also disputed whether her book chapter was a publication for her research assessment because the book lists it as an appendix rather than a scholarly contribution.  Kiser and Prater took no issue with Plaintiff's degree or publication.

But because Hingorani and Wang did not score her book chapter as research on her assessment, Plaintiff's score in that section fell below the required 2.0, while her overall score surpassed the requisite 3.0.  Hingorani, as dean, thus reported the PRC's split verdict to Carl Pettis ("Pettis")—provost and vice president of academic affairs—with his own recommendation to deny promotion due to lack of terminal degree and research.

Plaintiff's 2017–2018 TRC was made up by Hingorani, Kiser, Prater, Wang, Manoj Mishra ("Mishra"), Sun Gi Chun ("Chun").  Again, Hingorani sat as chair in the place of

the Plaintiff.  As in her PRC, only Kiser and Prater considered the Plaintiff's book chapter in their research assessment, and thus recommended tenure.  The other four TRC members considered it an appendix and did not give her high enough marks in research, and thus did not recommend tenure.  Hingorani reported these findings with his own recommendation to Pettis that Plaintiff be denied tenure.

Pettis independently reviewed Plaintiff's dossier and application for promotion and tenure.  He decided not to recommend her for either because he thought the book chapter, which he also interpreted to be an appendix, was not a "contribution to a scholarly published article." (Doc. 22-2 at 59).  Therefore, he found the "volume" of her research not "commensurate with recommending tenure" or promotion. (*Id.* at 56).  The lack of qualifying research was the sole reason for Pettis' decision to deny Plaintiff's applications, not the level of her degree.  Furthermore, Pettis did not base his decision on the committees' or Hingorani's recommendations; "[his] recommendation that went forth to the President would have remained the same" even if they had recommended promotion and tenure. (*Id.* at 50).  The President concurred with Pettis' recommendation, who accordingly informed Plaintiff that her name had not been passed on to the board of trustees for promotion and tenure, effectively rejecting her application.

After this denial, Plaintiff asked Pettis to send her the scoring documents he used in reviewing her applications so that she could improve future applications.  Pettis, however, did not use scoring documents in his review; so, he only sent her the scoring sheets prepared by the faculty on her PRC and TRC.  The day after Hingorani sent Pettis the TRC and PRC

recommendations, Pickard, the author of the book for which Plaintiff co-authored a chapter, sent Hingorani a letter clarifying Plaintiff's "valuable" scholarly contribution to his book. Therein he clarified that though the final section of the book, titled "The Next Step and Where to Learn More," was listed as an appendix, it functioned more like a book chapter and was a valuable portion of the text. Pettis never saw this letter prior to this litigation.

### 2.   *2017–2018 Grievance*

In accordance with the handbook, Plaintiff appealed to the FGC the denial of her 2017–2018 promotion and tenure applications, asking for protection from retaliation. She claimed the males on her committees colluded to give her low assessment scores to deny her tenure and promotion. Plaintiff reported that before the committees met, the male faculty members met to discuss her dossier and coordinated scores, in violation of the handbook, which required members to review a candidate's dossier *individually* until they meet as a committee. Indeed, only the male members of Plaintiff's committees scored her low on research, which she said male professors at COBA regularly did in scoring female candidates. The FGC recommended to Pettis that the Office of the Provost and Academic Affairs conduct "an independent and impartial evaluation" of Plaintiff's applications because it "found evidence the culture [of COBA] may lead to iniquitous outcomes in the promotion and tenure process." (Doc. 22-25 at 3).

Pettis read the FGC's report on the merits but decided not to do another review of Plaintiff's applications because he had already satisfied the FGC's recommendation by

conducting his initial impartial and independent review of her applications.  He thought he had already addressed the FGC's concerns, especially because any alleged improprieties at the committee level did not affect his decision to deny Plaintiff tenure based on a lack of research, which he stated "would have remained the same" regardless of the committees' recommendations. (Doc. 22-2 at 50).  He determined that denial of Plaintiff's tenure and promotion applications remained appropriate.  In the fall of 2018, after she was denied tenure and promotion, Plaintiff approached Pettis as he exited a meeting and, speaking of her previous grievances, told him, "I am going to quietly reapply, but I will not take it on the chin again and would have to take my complaints beyond the university if I have problems again." (Doc. 30-9 at 9).

### 3.     *2018–2019 Promotion and Tenure Application*

Plaintiff resubmitted her applications during the 2018–2019 academic year.  Her dossier was largely the same as the year before, except she added two recent journal publications to which she contributed as a co-author.  Taking these new publications into account, her PRC in 2018–2019—composed of Hingorani, Kiser, Prater, Chun, and Sontachai Suwanakul ("Suwanakul")—scored her research over 2.0.  Chun and Suwanakul, both male professors, were the only members to not recommend promotion because they did not consider her degree to be terminal in her teaching field.

Her TRC in 2018–2019 consisted of Hingorani, Kiser, Prater, Suwanakul, Chun, Dave Thompson ("Thompson"), Adarsh Kakar ("Kakar"), and B.K. Robertson.  Of this panel, only Kiser and Prater were females.  Unlike her PRC, the TRC gave her an overall

10

research assessment score of 1.87, and six male members voted against granting her tenure, while only Kiser, Prater, and Thompson voted in favor. Hingorani communicated the committees' conclusions to Pettis, noting in particular that six members of the TRC took issue with the lack of Plaintiff's terminal degree in marketing. The six members also did not think Plaintiff demonstrated meaningful research because her newly published articles were in a "very-low quality journal" that was "not a journal for Marketing educators" and she was "not the lead author in either of the publications." (Doc. 22-31). Finally, Hingorani noted that the 2018–2019 academic year should have been Plaintiff's fifth probationary year, and thus she would have one more opportunity to apply for tenure.

Pettis again conducted an independent review of Plaintiff's dossier. For his assessment of her research contributions, he looked for "evidence of scholarly activity such as papers or research, research submissions." (Doc. 22-2 at 56). Because he did not consider Plaintiff's book chapter to be a scholarly contribution, he found that the overall "volume" of her research, dating back to when she began as an assistant professor in 2014, "wasn't commensurate with recommending tenure." (*Id.*). As in the year before, the lack of research was the sole factor in his decision, not her degree. Pettis did agree with the PRC, however, that Plaintiff should receive a promotion to associate professor, and he communicated to Plaintiff the approval of this decision by the board of trustees.

Pettis nonetheless determined the Plaintiff's research to be insufficient to award tenure, and informed her that her name had not been passed on to the board of trustees on agreement by the President. Pettis also informed Plaintiff that the 2018–2019 was her sixth

11

probationary year; thus, she would be issued a terminal contract for the 2019–2020 academic year. He issued a terminal contract because he reviewed the employment documents from when she was hired as an assistant professor. Her 2014 Notice of Employment erroneously placed her in her fifth probationary year. The then-provost issued Plaintiff a notice at the end of the 2013–2014 academic year, warning that she must obtain tenure by the end of the 2014–2015 academic year—her then-listed sixth probationary year—or she would be issued a terminal contract. Plaintiff and the dean of COBA at the time highlighted the error to the provost, noting that it was impossible for her to apply for tenure because, having only been hired in January 2014, Plaintiff had not met the requisite four-years employment as an assistant professor. The provost's office corrected the error in her probationary calculation, listing the 2014–2015 academic year as her second probationary year. Her salary computations from 2014–2018 noted this re-calculation.

The calculation, however, did not consider that Plaintiff actually began her first probationary year in January 2014, not August 2013, and should have run until January 2015. Therefore, when Pettis reviewed Plaintiff's employment records, he saw that her probationary periods ran from the beginning of the academic year rather than in January, thus her sixth probationary year, according to the records, ran from August 2018 to August 2019. Based on that calculation, which was the only record of Plaintiff's employment on file, he issued her a terminal contract for 2019–2020.

### 4.    *2018–2019 Grievance*

Plaintiff appealed the denial of her 2018–2019 tenure application and Pettis' issuance of a terminal contract with the FGC.  As to her denial of tenure, she complained about the following:  (1) the arbitrary and capricious evaluation standards employed on her dossier compared to historical approvals by COBA; (2) the discriminatory scoring by the TRC; (3) the disregard for her credentials in the evaluation process; and (4) collusion and discrimination by members of the TRC in predetermining scoring agreements prior to the review meeting.  The FGC found Plaintiff's complaints meritorious because "there [was] a strong possibility that [Plaintiff] was not treated with complete fairness . . . [through] deviat[ion] both from the letter and the spirit of the procedures outlined in the *Faculty Handbook*." (Doc. 22-35 at 2).

First, the FGC found that the TRC ought not to have denied Plaintiff tenure based on her degree status because the TRC was misinformed regarding degree qualifications for tenure in the handbook.  Second, the FGC found a "substantial likelihood . . . that she was not treated fairly with regard to the scoring of her Research Activities." (*Id.* at 7).  It based this conclusion on reports by Kiser and Prater that TRC members shared scores prior to meeting with the entire committee, in violation of the handbook.

Pettis, consulting with the President and reviewing the FGC's report, decided the denial of Plaintiff's tenure would stand.  Specifically, Pettis noted that the report was "heavily laden with assumptions and speculation, [n]othing . . . clearly establish[ing] that there was any violation of the procedures for awarding tenure." (Doc. 22-37).  Pettis also

13

noted, as he did for Plaintiff's 2017–2018 applications, that even if the TRC had recommended tenure, he would not have so recommended because he thought her research contributions lacking.

As to the issuance of Plaintiff's terminal contract, the FGC noted the error in calculating her probationary periods from the beginning of the academic year rather than in January. They noted that because she began her probationary contract on January 1, 2014, she would not enter her sixth probationary year until January 1, 2019, thus giving her one more chance to apply for tenure.

Pettis rejected the FGC's recommendation because the manner in which it calculated its dates for the probationary contract was "not commensurate with the practices of the University nor . . . with the records regarding [Plaintiff's] employment." (Doc. 22-36). The only record of Plaintiff's hiring noted that the 2014–2015 academic year was her second probationary year. Based on that calculation, Pettis determined that she would enter her terminal year during the 2019–2020 academic year.

## C.    Treatment of Male Professors at COBA

Plaintiff offers testimony that Hingorani, the COBA dean, engaged in discriminatory treatment of women. (*See* Doc. 30-9 at 6–7). However, the list of examples of such treatment offered by Plaintiff lacks sufficient specificity and context. Notably, Hingorani was not the decisionmaker regarding the employment decisions about which Plaintiff brings her complaint. The Plaintiff does, however, identify Robert McNeal

("McNeal") and Kakar as comparators who received preferential treatment in their tenure applications.[2]

### 1.    *McNeal's tenure application*

McNeal received tenure during the 2016–2017 academic year, with five faculty members on his TRC recommending tenure, while two did not.  Those recommending tenure were Wang, Saad Bakir ("Bakir"), Chun, Suwanakul, and Mishra.  Prater and Kiser did not recommend tenure.  McNeal's overall score was 3.09, and his research score was 2.17, both over the required minimum for tenure.  There was a discrepancy in scoring his community service, which made up 5% of his overall score.  Four male professors rated McNeal very high in this category, while two females and a male said he had a virtually non-existent record of community service.

Plaintiff was not on McNeal's TRC because she was not tenured, and only tenured ASU faculty could compose a TRC.  However, as the chair of COBA's business administration department at the time, Plaintiff was concerned that McNeal did not have sufficient research to receive tenure.  She approached Pettis, associate provost at the time, about her concern.  Pettis instructed Plaintiff to put all of McNeal's research into consideration in his dossier to give him a better chance of obtaining tenure.  However, when Kiser, a woman, was up for tenure, Pettis asked Plaintiff to provide additional

---

[2]  In her declaration, Plaintiff asserts that Chun was treated more favorably in his tenure review process regarding scholarly writing.  However, the evidence shows that Chun was awarded tenure in 1998.  (Doc. 34-1).  Plaintiff fails to show that Chun is a valid comparator.

information about the quality of her publications, while nobody attended the same scrupulosity to McNeal's publications.

### 2.  *Kakar's tenure application*

Upon unanimous approval by his TRC, Kakar received tenure during the 2017–2018 academic year within the department of computer information science.  His TRC— composed of Wang, Kiser, Suwanakul, Chun, Prater, and Mishra—gave him a 3.48 overall score, and 3.78 in research contributions.  The TRC did not dispute that his terminal degree, a Ph.D. in Management Information Systems, was a terminal degree in his teaching field.

## D.    Plaintiff's Resignation

Before Plaintiff's contract terminated at the end of the 2019–2020 academic year, she began seeking employment elsewhere.  On November 1, 2019, Plaintiff filed a Charge of Discrimination against ASU with the Equal Employment Opportunity Commission ("EEOC").  Effective January 7, 2020, she resigned from her position at ASU to begin employment at another institution.  She continued to pursue her grievances against ASU and said that she would return to ASU if it granted her tenure.  After exhausting her administrative remedies at the EEOC, Plaintiff timely brought this action on August 8, 2021.

## V.  DISCUSSION

Absent direct evidence of sex discrimination or retaliation, as is the case here, a plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*,

16

411 U.S. 792 (1973); *see also Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).

Under this framework, an employee creates a presumption of unlawful discrimination by

first establishing a prima facie case of discrimination. *See Lewis v. City of Union City*

(*Lewis I*), 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).  The burden then shifts to

the employer "to articulate a legitimate, nondiscriminatory [and non-retaliatory] reason for

its actions." *Id.* at 1221 (citing *Burdine*, 450 U.S. at 253).  If the employer articulates a

legitimate, non-discriminatory, and non-retaliatory reason, then the burden returns to the

employee to prove that the employer's proffered reason was pretext for unlawful

discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008).

The *McDonnell Douglas* framework, however, is not "the *sine qua non* for a

plaintiff to survive a summary judgment motion in an employment discrimination case."

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of

fact exists if the record, viewed in a light most favorable to the plaintiff, presents a

convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

discrimination by the decisionmaker." *Id.* (footnote omitted) (quotations and citation

omitted).  A plaintiff may establish a "convincing mosaic" with "evidence that

demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other

bits and pieces from which an inference of discriminatory intent might be drawn,

(2) systematically better treatment of similarly situated employees, and (3) that the

employer's justification is pretextual." *Lewis v. City of Union City* (*Lewis II*), 934 F.3d

1169, 1185 (11th Cir. 2019) (alteration adopted) (quotations and citation omitted).

17

ASU has moved for summary judgment on Plaintiff's sex discrimination and retaliation claims.  In her response, Plaintiff argues that a genuine dispute of fact remains as to whether ASU discriminated against her because of her sex and whether it retaliated against her because of her sex discrimination complaints.

## A.     Motion to Strike

Before addressing the motion for summary judgment, as an initial matter, the Court turns to ASU's motion to strike plaintiff's declaration. (Doc. 32).   ASU argues that Plaintiff's declaration (doc. 30-9) is an inadmissible sham affidavit.  Although ASU seeks to strike Plaintiff's affidavit because it is inadmissible, Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Once an objection is made, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56, advisory committee's note to 2010 amendments.  Therefore, because "[t]he plain meaning of these provisions show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of *summary judgment procedure*, rather than a separate motion to be handled preliminarily," the court construes ASU's motion to strike as a Rule 56(c)(2) objection. *Campbell v. Shinseki*, 546 F. App'x 874, 879 (11th Cir. 2013); *see, e.g.*, *Beasley v. 500 Finishes Corp.*, 2018 WL 3848815, at *4 (M.D. Ala. Aug. 13, 2018) (doing the same).

A court may disregard a declaration filed in opposition to a Rule 56 motion for summary judgment as a sham if the affidavit "contradicts . . . prior testimony without

18

giving any valid explanation." *Van T. Junkins and Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 656 (11th Cir. 1984).  However, "[t]his rule is applied sparingly because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007).  To determine at the summary judgment stage whether a declaration should be disregarded as a sham, courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1282 n.3 (11th Cir. 2020).  In other words, courts "must construe [an affiant's] statements" in a way, if one exists, that could reasonably lead to no contradiction. *Id.*  A declaration "should be considered" even if "it differs from or varies from . . . evidence as given by deposition . . . and the two in conjunction may disclose an issue of credibility." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (alteration adopted) (quoting 6 MOORE'S FEDERAL PRACTICE ¶ 56.15[4] (2d ed. 1985)).  In other words, "every failure of memory or variation in a witness's testimony" should not "be disregarded as a sham." *Id.*  Variations or failure in memory may "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all"; but those variations "may only be disregarded as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Id.* at 954 (quotation and citation omitted).

ASU claims that portions of Plaintiff's declaration contradict her deposition testimony.  However, a review of the Plaintiff's declaration reveals that it does not directly

contradict her deposition testimony such that it constitutes a sham.  For example, in her declaration, Plaintiff's asserts that she complained about Hingorani referring to other female professors, in addition to Kannan and Rouhan Wu ("Wu"), as "girls."  However, when specifically asked in her deposition about whether Hingorani called female professors, other than Kannan and Wu, "girls," Plaintiff testified, "I don't know.  Those are the ones that I recall and can give you right off the top of my head." (Doc. 22-7 at 30).  This elucidation by the Plaintiff in her declaration falls far short of the type of direct contradiction required for a declaration to be disregarded as a sham. Instead, it presents more as a "failure of memory" that may be considered at summary judgment. *See Tippens*, 805 F.2d at 953.  The portions of the Plaintiff's declaration to which ASU objects do not directly contradict her deposition testimony.  Therefore, the Court finds ASU's motion to strike (doc. 32) is due to be DENIED.

**B.     Discrimination Based on Sex**

Plaintiff claims that ASU discriminated against her based on her sex in violation of Title VII when it denied her tenure during the 2018–2019 academic year.  She contends that ASU treated her less favorably than male professors, namely Kakar and McNeal.  Plaintiff argues that her claim survives summary judgment when analyzed under both the traditional *McDonnell Douglas* framework and a "convincing mosaic" theory of circumstantial evidence.

### 1.    McDonnell Douglas

To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Plaintiff must show:  (1) she belonged to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question, and (4) her employer treated "similarly situated" employees outside her protected class more favorably. *Lewis I*, 918 F.3d at 1220–21.  ASU does not dispute that Plaintiff belonged to a protected class and that she was subjected to an adverse employment action. (Doc. 21 at 18).  Moreover, for the purposes of prima facie analysis, ASU does not dispute that Plaintiff was qualified for her job. (*Id.* at 18 n.1).  It does argue, however, that Plaintiff cannot point to a similarly situated comparator outside of her protected class who received more favorable treatment.  In response, Plaintiff argues that she was treated less favorably than Kakar and McNeal, assistant professors who were given tenure just before or during the years that she applied.

Generally, "to meet the comparability requirement a plaintiff is required to show that [s]he is similarly situated in all relevant aspects to the non-minority employee." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).  A "comparator  must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *United States v. Brantley*, 803 F.3d 1265, 1272 (11th Cir. 2015). Decisions to grant tenure "are unique because they involve a myriad of considerations and are made by numerous individuals and committees over a lengthy period of time." *Martin v. Auburn Univ. Montgomery*, 908 F. Supp. 2d 1259, 1267 (M.D. Ala. 2012) (quotations

21

and citation omitted). "[I]t is not the duty of this court to evaluate whether the decision to deny tenure . . . was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes." *Jeongah Kim v. Bd. of Trs. of Ala. Agr. and Mech. Univ.*, 2014 WL 4792428, at *9 (N.D. Ala. Sept. 24, 2014) (citing *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

Courts in this circuit that examine comparators in the tenure discrimination context have found faculty members to be similarly situated when they are "in the same department and sought promotion and tenure in accordance with procedures that were applicable to both, and the time that each applied for promotion and tenure is reasonably related." *Morrow v. Auburn Univ. at Montgomery*, 973 F. Supp. 1392, 1406 (M.D. Ala. 1997); *see also Jun Zhang v. Troy Univ.*, 2012 WL 3631547, at *8 (M.D. Ala. July 23, 2012); *Jeongah Kim*, 2014 WL 4792428, at *9. Courts have also found a plaintiff not sufficiently similar to a putative comparator when they worked in "different departments, had different department chairmen, and were reviewed, at least in part, by different evaluators." *Hossain v. Steadman*, 855 F. Supp. 2d 1307, 1314 (S.D. Ala. 2012); *see also Tapp v. St. Louis Univ.*, 78 F. Supp. 2d 1002, 1016 (E.D. Mo. 2000) (finding comparator was not similarly situated where decisions were separated by years, under different deans, and the members of the tenure committee were different).

Neither Kakar nor McNeal are similarly situated comparators to Plaintiff. Kakar was in a different department than Plaintiff. McNeal applied for tenure in a different application cycle than Plaintiff. The candidates were evaluated by different sets of

evaluators.  Notably, Hingorani did not serve on either Kakar's or McNeal's committees, while he did participate in Plaintiff's evaluation process.  Additionally, Pettis was not the final decisionmaker during McNeal's tenure application in the 2016–2017 academic year because he did not become Provost until the following year. *See Hossain*, 855 F. Supp. 2d at 1314; *Tapp v. St. Louis Univ.*, 78 F. Supp. 2d at 1016.

Moreover, the areas of review in which Plaintiff asserts the two men, Kakar and McNeal, received more favorable treatment do not correlate to the area in which she claims to have received unfair treatment.  The committee took issue with the fact that she did not hold a terminal degree in her teaching area.  Plaintiff contends that Kakar likewise did not hold a terminal degree in his field, computer information systems.  However, Plaintiff's argument on this point is merely conclusory because the only evidence regarding Kakar's Ph.D. in Management Information Systems is that it was a terminal degree offered by his university's college of business, which was treated by his TRC as a terminal degree in his field.  Moreover, Plaintiff's degree did not factor into the final decision to deny Plaintiff tenure, which Pettis asserted was due solely to her lack of research, and Plaintiff has not presented evidence showing otherwise.

Plaintiff does not argue that Kakar or McNeal received more favorable treatment in their research assessments.  Rather, Plaintiff contends that the men received a higher score than they deserved in the area of community service, an area in which her scores were quite high.  Plaintiff, however, does not dispute the weight given to their scholarly contributions in their tenure review, which was the issue in her review. *Cf. Wu v. Thomas*, 847 F.2d 1480,

23

1484 (11th Cir. 1988) (holding appellant "failed to prove that an equally or less qualified male was promoted during the time of her promotional application" because a male granted tenure during her cycle was "more qualified than appellant as evidenced by the regularity and recency of his publications"). Due to these marked differences in Plaintiff's and her putative comparators' tenure review processes, they are not sufficiently similarly situated to satisfy the fourth prong of her *McDonnell Douglas* prima facie case.

### 2. *Convincing Mosaic*

Plaintiff argues, in the alternative, that her sex discrimination claim survives summary judgment because she has established a convincing mosaic of circumstantial evidence of intentional discrimination. Even though circumstantial evidence may prove a "convincing mosaic" of discrimination with evidence of, "among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual," the circumstantial evidence must provide more than "a suspicion or a guess." *Lewis II*, 934 F.3d at 1185 (alteration adopted) (quotations and citations omitted); *Smith*, 644 F.3d at 1328 n.25 (citation omitted).

Plaintiff asserts the following evidence demonstrates a convincing mosaic of intentional discrimination: (1) ASU deviated from its procedures for reviewing tenure and promotion applications by Plaintiff and other female employees; (2) male faculty in COBA received better treatment during the tenure process; (3) Plaintiff and her female colleagues

24

received systematically worse treatment while at COBA; (4) Pettis failed to investigate Plaintiff's complaints of discrimination; and (5) ASU's reason for denying Plaintiff tenure was pretextual.[3]

To her first, second, and third pieces of the putative mosaic, Plaintiff has not provided sufficient evidence that any improprieties or procedural deviations marred the ultimate decision to deny Plaintiff tenure.  Assuming true the actions allegedly taken by Hingorani or the male members in COBA, any improprieties had insufficient causal impact because Pettis was the final decisionmaker in denying her tenure.  Pettis has presented unrebutted evidence that his review of the Plaintiff's research alone influenced his decision, not her degree level or the scoring provided by the TRC or Hingorani. (*See* Doc. 22-2 at 47, 56, 59).  Particularly, Pettis noted that even if the men on her TRC had recommended tenure because they found her scholarly research sufficient, Pettis would nevertheless have denied tenure because he thought her book chapter was "not a contribution to a scholarly published article" and the overall volume of her research going back to 2014 was incommensurate with awarding tenure. (*Id.* at 50, 59).

Plaintiff contends that Pettis, before he was provost, instructed Plaintiff to provide all of McNeal's research in his tenure application to give him a better chance of qualifying.  She maintains that this fact raises the inference that Pettis discriminated against Plaintiff by narrowing the scope of her research under consideration.  However, Plaintiff does not argue that Pettis failed to consider one of her publications; she simply disagrees with the

---

[3] The Court will discuss Plaintiff's pretext argument *infra* Part V.B.3.

25

scholarly weight that Pettis gave to her book chapter, which he felt was "not a contribution to a scholarly published article." (Doc. 22-2 at 59).  Decisions on the weight granted to scholarly contributions in the tenure application process is left to the employer's discretion and does not give rise to an inference of discrimination. *See Martin*, 908 F. Supp. 2d at 1274 ("The weight [plaintiff] seeks to attribute to . . . publications, often without evidentiary support in [the university's] tenure requirements . . . , is the province of the [university's] reviewers, not the court or a jury." (citing *Kossow v. St. Thomas Univ., Inc.*, 42 F. Supp. 2d 1312, 1317 (S.D. Fla. 1999) (rejecting plaintiff's argument that his publications were not given sufficient credit, stating "neither the Court, nor the jury need evaluate the degree of scholarship in the law review articles"))); *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (citation omitted) (explaining that courts do not second-guess an employer's business judgment); *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998) (holding courts "must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's action").  These pieces of Plaintiff's mosaic, therefore, without more, do not give rise to the inference that ASU intentionally discriminated against Plaintiff based on her sex.

To the fourth piece of her mosaic, Plaintiff has not provided sufficient evidence that Pettis failed to adequately investigate her claims.  The FGC investigated the grievances and recommended Pettis independently and impartially review her 2017–2018 application because "the culture [of COBA] may lead to iniquitous outcomes in the promotion and

26

tenure process." (Doc. 22-25 at 3).  In the second year, the FGC recommended that Plaintiff be granted tenure based on, among other things, its disagreements with the TRC on the weight given to her research publications and her terminal degree. (Doc. 22-35 at 5–6).

Pettis read the FGC reports both years and concluded that the FGC gave no evidentiary support for its conclusions, disagreed with their investigative methods and analysis, and decided against reviewing Plaintiff's application again because he already conducted an independent, impartial review of her dossier, finding tenure inappropriate due to the lack of research. (Doc. 22-2 at 50, 59).  He felt that any concerns raised by the FGC both years were already "addressed as part of [his initial] review." (*Id.* at 50).  Any failure to investigate further thus does not give rise to an inference of sex discrimination.

### 3.    *Pretext*

Notwithstanding Plaintiff's failure to demonstrate a prima facie case or a convincing mosaic of discrimination, Plaintiff does not rebut ASU's legitimate, nondiscriminatory reason for denying her tenure.   The defendant's burden to produce a legitimate, nondiscriminatory reason for its adverse employment action is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

ASU contends that it denied Plaintiff tenure due to insufficient scholarly work produced during her probationary employment.  This explanation satisfies ASU's burden of production. *See Martin*, 908 F. Supp. 2d at 1269 (finding subjective reasons involved in judging the sufficiency of scholarly works are "acceptable non-discriminatory reasons for employment actions" and that tenure decisions "necessarily rely on subjective judgments

27

about academic potential" (quoting *Chapman*, 229 F.3d at 1030, and *Vanasco*, 137 F.3d at 968)).

Once the employer articulates legitimate, nondiscriminatory reasons for its decision, "the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). The plaintiff "cannot succeed by simply quarreling with the wisdom of [the employer's] reason," and instead "must confront the employer's seemingly legitimate reason . . . 'head on and rebut it.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013) (citations omitted). "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence,'" such that a rational trier of fact could disbelieve the employer's proffered nondiscriminatory reason. *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). To show pretext indirectly, the plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1265 (citation omitted). An employer's "reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

According to Plaintiff, there is a reasonable inference of pretext here because ASU deviated from its standard tenure and promotion review procedures.  As discussed above, however, even assuming the male members on her TRC violated procedure to keep the Plaintiff from receiving tenure, Pettis—the final decisionmaker in denying tenure—provided evidence that he would not have recommended tenure even if the TRC had done so.  He did not find it appropriate to recommend Plaintiff for tenure because she lacked sufficient scholarly research over the period of her employment as an assistant professor. (*See* Doc. 22-2 at 50).  Plaintiff has offered insufficient evidence to rebut his explanation. Thus, the TRC's purported deviation from procedure does not raise an inference from which a reasonable jury could find ASU's final decision was pretext for intentional sex discrimination.

ASU also provides evidentiary support, unrebutted by Plaintiff, that Pettis reviewed all reports submitted across both application cycles.  Pettis testified at his deposition that he conducted an independent review of both her 2017–2018 and 2018–2019 applications, as well as the reports submitted by the FGC both years. (*See* Doc. 22-2 at 46, 50).  Although Pettis admitted he used no scoring documents during his reviews, Plaintiff has not demonstrated that he was required to do so.  Likewise, Pettis dismissed the FGC's reports as "ladened with assumptions and speculation" because he thought they did not provide sufficient evidentiary support for its conclusions. (Doc. 22-2 at 51).

Plaintiff does not present sufficient evidence to rebut ASU's evidence that Pettis conducted an independent review of both reports during both application cycles.

Moreover, Plaintiff does not address how the weight Pettis gave to her scholarly publications was driven by intentional sex discrimination. *Kidd*, 731 F.3d at 1206. Thus, Plaintiff has not sufficiently met ASU's legitimate, nondiscriminatory reason for denying her tenure "head on" by showing it to be pretext for sex discrimination. *Id.* The Court will not quarrel with ASU's decisions to grant or deny tenure absent evidence that the decisions were intentionally discriminatory. *See id.*; *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long as its action is not for a discriminatory reasons."), *abrogated on other grounds by Lewis I*, 918 F.3d 1213.

This case involves the "long-standing rule in academia of 'publish or perish.' Whatever the merits of that tradition, it is not up to the courts to interfere with an institution . . . which aspires to be accepted in the academic circles that adhere to that proposition." *Kossow*, 42 F. Supp. 2d at 1317. Thus, on this record, Plaintiff has failed to demonstrate inconsistencies in ASU's proffered legitimate reason sufficient to allow a "reasonable factfinder [to] find [it] unworthy of credence." *See Alvarez*, 610 F.3d at 1265 (citation omitted). Accordingly, Plaintiff has failed to present sufficient evidence to show a genuine dispute of fact as it pertains to pretext, and the motion for summary judgment on her sex discrimination claim is due to be GRANTED.

## C.     Retaliation

Plaintiff also maintains that ASU denied her tenure and issued her a terminal contract for the 2019–2020 academic year in retaliation for complaining about sex discrimination.   Retaliation claims brought under Title VII are also subject to the *McDonnell Douglas* burden-shifting analysis. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).

A prima facie case of retaliation requires a plaintiff to show that (1) "she engaged in statutorily protected activity," (2) "she suffered an adverse action," and (3) "the adverse action was causally related to the protected activity." *Id.* (citation omitted).   Statutory protections are not limited to those who file formal complaints; they also extend to those who voice informal complaints "to their superiors or who use their employers' internal grievance procedures." *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam).

A plaintiff engages in a statutorily protected activity if she filed either a formal complaint or voiced an informal complaint that "explicitly or implicitly communicate[s] a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citation omitted).   A plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* (citation omitted).   Her burden includes both a subjective and an objective component—"[t]hat is, the plaintiff must not only show that she subjectively (i.e., in good faith) believed the defendant was engaged in unlawful

employment practices, but also that her belief was *objectively* reasonable in light of the facts and record present." *Id.* (emphasis in original) (quotations and citation omitted).

A plaintiff satisfies the causation element of the prima facie case if she demonstrates that "the protected activity and the adverse action were not wholly unrelated." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citation omitted). She can establish a causal link by demonstrating a "close temporal proximity between" the protected activity and the adverse employment action. *Id.* (citation omitted).

If the plaintiff establishes a prima facie case of retaliation, then there is a "presumption that the adverse action was the product of an intent to retaliate." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). The burden then shifts to the employer to rebut this presumption by "articulating a legitimate, non-[retaliatory] reason for the employment action." *Gogel*, 967 F.3d at 1135.

ASU does not dispute that Plaintiff suffered an adverse employment action. It argues, instead, that she did not engage in a statutorily protected activity and that the adverse employment action was not causally related to her purported sex discrimination complaints. Even if Plaintiff could make out a prima facie retaliation claim, ASU maintains that she cannot rebut its legitimate, non-retaliatory reason for denying her tenure and issuing her a terminal contract.

Plaintiff contends that she satisfied a prima facie retaliation case because, first, she had a reasonable belief that she was being discriminated against based on her sex. She also argues that her FGC grievance filed during the 2018–2019 academic year—specifying her

32

concern that men on her TRC discriminated against her—was a protected activity.  She also maintains that she articulated this complaint to Pettis as well.  The temporal proximity between these activities and the issuance of Plaintiff's terminal contract, according to Plaintiff, satisfies the causal connection element of her prima facie retaliation case.

The Court can assume without deciding that Plaintiff has sufficient evidence to establish a prima facie retaliation claim.   Nonetheless, the Plaintiff does not present sufficient evidence to demonstrate that ASU's legitimate, non-retaliatory reason for denying her tenure and issuing her a terminal contract were mere pretext for retaliation.  First, ASU, as discussed above, has satisfied its "exceedingly light" burden to produce evidence that it had legitimate reasons to deny Plaintiff tenure. *Perryman*, 698 F.2d at 1142.  Furthermore, ASU claims it issued Plaintiff a terminal contract based on Pettis' interpretation of Plaintiff's employment documents, which put her past her sixth probationary year. (Doc. 22-2 at 53).  Pettis reviewed her 2014 notice of employment that placed her on a tenure track, along with its accompanying correction, which he interpreted to mean that the academic year from August 2014–August 2015 was Plaintiff's second probationary year. (*Id.* at 41).  According to this calculation, August 2018–August 2019 would have been her sixth probationary year, indicating that she would have had to obtain tenure by the end of that academic year to avoid a terminal contract.  Because she failed to do so, Pettis issued her a terminal contract for the 2019–2020 academic year.  These explanations satisfy ASU's burden to produce evidence of legitimate, non-retaliatory reasons for denying her tenure and issuing a terminal contract.

As in the discrimination context, if an employer successfully bears its burden of production for a legitimate, non-retaliatory reason, then the burden shifts back to the plaintiff to demonstrate that the "proffered reason was merely a pretext to mask retaliatory actions"—in other words, "*both* that the reason was false, *and* that retaliation was the real reason." *Gogel*, 967 F.3d at 1135, 1136 (emphasis in original) (alterations adopted) (citations omitted).  It is at this crucial stage that the plaintiff must establish but-for causation:  she must demonstrate that her "protected activity was a but-for cause of the alleged adverse action by the employer," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), or, in other words, that she would not have been issued a terminal contract had she not engaged in the protected activity. *Gogel*, 967 F.3d at 1135.  The burden of persuasion remains on the employee throughout. *Id.*

The Eleventh Circuit has cautioned courts to avoid "adjudging whether employment decisions are prudent or fair.  Instead, [the] sole concern is whether unlawful [retaliatory] animus motivate[d] a challenged employment decision." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (citation omitted).  To avoid summary judgment, therefore, Plaintiff must rebut ASU's proffered reasons with evidence that will allow jurors to conclude that ASU's stated reasons for firing her were pretext for retaliation. *Chapman*, 229 F.3d at 1037.

Plaintiff does not directly address her burden to show pretext; instead, she relies on her prima facie causal connection argument to also rebut ASU's legitimate, non-retaliatory reasons for issuing her a terminal contract.  Specifically, in addition to temporal proximity, Plaintiff argues that there is an "inference of causation" due to the "numerous deviations"

34

and mistakes made in ASU's tenure review procedures.   However, although these inferences may be relevant to show a "causal connection" in prima facie retaliation analysis, they provide insufficient evidence to show pretext: that Pettis' articulated reasons for denying Plaintiff tenure and issuing her a terminal contract were both "false, *and that retaliation was the real reason.*" *Gogel*, 967 F.3d at 1135; *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021) ("Although [plaintiff's] temporal-proximity arguments may be enough to establish a prima facie case of retaliation, temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual.").

Plaintiff does not argue or produce evidence demonstrating that her protected activity was the but-for cause of Pettis issuing the terminal contract and denying her tenure, such that his proffered reasons were mere pretext.   All cases cited by Plaintiff supporting an "inference of causation" based on a chain of retaliatory activity occurred at the "causal connection" stage of a prima facie case, not at the pretext stage to rebut an employer's non-retaliatory reasons for an adverse employment action.   Plaintiff presents insufficient evidence to suggest that ASU's "stated reasons for ending [Plaintiff's] employment were merely an excuse to cover up retaliation." *Todd*, 998 F.3d at 1220.

Instead, the evidence shows that Pettis' calculation of the years left on her probationary contract was a clerical or interpretive mistake, not retaliation. *See Silvera*, 244 F.3d at 1261 (holding pretext means more than a mistake by the employer; actions taken based on a mistaken, non-discriminatory belief do not violate Title VII); *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) ("A plaintiff must show not merely that

the defendant's employment decisions were mistaken but that they were in fact motivated by sex."); *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). Plaintiff has failed to satisfy her burden of persuasion that, absent her purported complaints of sex discrimination, Pettis would not have issued her a terminal contract or denied her tenure. *See Gogel*, 967 F.3d at 1135. Thus, on this record, Plaintiff has not produced sufficient evidence to create a genuine dispute of fact as to ASU's legitimate, non-retaliatory reasons for taking adverse employment actions against Plaintiff, and summary judgment on her retaliation claim is warranted. *Id.*

## VI.  CONCLUSION

Accordingly, and for good cause, it is

ORDERED that the Defendant's motion to strike plaintiff's affidavit (doc. 32) is DENIED.  It is further

ORDERED that the Defendant's motion for summary judgment (doc. 20) is GRANTED, and Plaintiff's claims against ASU are DISMISSED with prejudice.

A separate judgment will enter.

DONE this 15th day of March, 2023.

/s/ Emily C. Marks
_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE
